

## NUMBER 13-10-00193-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**A.B. MANSFIELD AND CLINTON JOSEPH FINDLEY,**    **Appellants,**

**v.**

**KIMBERLY MORVANT RUSSELL AND THELMA
PEARL TRAHAN D/B/A TRAHAN TRUCKING,**    **Appellees.**

---

### On appeal from the 58th District Court
### of Jefferson County, Texas.

---

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Benavides
### Memorandum Opinion by Chief Justice Valdez[1]

Appellants, A.B. Mansfield and Clinton Joseph Findley, appeal a judgment

rendered on a jury verdict in their favor and against appellees, Kimberly Morvant

---

[1] This case is before this Court on transfer from the Ninth Court of Appeals in Beaumont pursuant to an order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

Russell and Thelma Pearl Trahan, d/b/a Trahan Trucking. By one issue, appellants contend that the trial court "erred in denying [their] motion for new trial as the evidence was factually insufficient to support a zero finding by the jury as to Mansfield's physical pain and mental anguish in the past; (Question 3a) and Findley's physical pain and mental anguish in the past. (Question 4a)." We affirm.

## I. THE EVIDENCE

Russell testified that while driving a dump truck hauling volcanic rock, she was involved in a collision with appellants who were in a van. According to Russell, the collision occurred when Mansfield, who was driving the van, came to a complete stop because a truck in front of him was turning off the highway. Russell stated that when the collision occurred, her truck was going five miles per hour. Her truck hit the back of the van, and Russell explained that Mansfield's van stopped her vehicle. Russell claimed that she was unable to avoid the collision.

Russell stated that the only damage she saw was to the "rear of the van" including that the "back glass was busted out, probably dented in." When asked if she saw that both front seats were "broken over backwards," Russell said, "No." Russell testified that when she went to the van to make sure everyone was okay, the passengers (later identified as Mansfield and Findley) were sitting upright in their seats. She asked the van's passengers if they were okay, and they responded that they were fine. Russell noticed that the driver (Mansfield) was "fidgeting for a cell phone, moving from side to side, digging around, trying to find a cell phone." Russell testified that the passengers then asked her about the truck driver that hit them, and she informed them

2

that she was the truck driver. According to Russell, the passengers then "both laid their [bucket] seats back."

On cross-examination, Russell clarified that the accident happened in 2005—approximately four years prior to the trial. Russell explained that she saw that the van had its brake lights turned on, the truck turned off the highway, the van's brake lights went off, the van moved forward, and then the van made a sudden stop. Russell claimed that she looked at the speedometer and observed that it was "fluctuating between 2 and 4 miles an hour" right before the collision occurred. Russell stated that when she exited her vehicle, she noticed that the driver of the van "moved the van from the middle of the intersection to the—just past the intersection to the right-hand shoulder of the road."

Russell then walked across the street to make sure the passengers were okay. Russell testified that the driver of the van stated, "We're fine." She claimed that both the driver and passenger responded to her inquiry. When asked if the driver was turning his head from side to side while fidgeting for the cell phone, Russell replied, "It was his whole body (demonstrating)." Russell stated that the driver was unaware at this point that she was the driver of the truck that hit the van and that both the driver and the passenger were seated in an upright position. According to Russell, once she identified herself as the truck driver involved in the accident, "He laid his seat—him and his passenger both laid their seats back. . . . [r]eclined, just dropped back." Russell stated that she felt "frustrated" when the passengers in the van dropped their seats back and that she was "shocked." Russell explained, "I became frustrated because they were

3

fine up until the point that I told them I was the driver; that until they knew I was the driver of the vehicle, they were okay." Russell returned to her truck.

Thelma Pearl Trahan testified that she owns Trahan Trucking, the company that employed Russell when the accident occurred. Trahan stated that she remembered "[b]asically nothing" about the accident. Trahan did recall that she was told that the dump truck had a dent in the fender after the accident occurred. When asked if she "chew[ed] out" Russell after the accident, Trahan responded, "She didn't do anything wrong. . . . Because she was walking and the other people were walking and they was doing fine. They weren't hurt. Believe me, if I'd thought they were hurt, I'd have been there."

Fronzi Trahan, Thelma's son, testified that he received a call either from Russell or another Trahan Trucking employee informing him that Russell had been involved in an accident. According to Fronzi, after he received the call about the accident, he drove to the scene; it took about thirty minutes for Fronzi to arrive at the scene. Fronzi stated that the van had a "little" damage to "the back window, like they said, was out of one of the doors and a little bent on the bumper or the back door." According to Fronzi, the dump truck had "[v]ery little" damage and the "bumper may have been scratched."

Findley testified that he is generally not sick, does not have a family doctor, and the last time he visited a doctor before the accident was twenty years ago to see "Dr. Oh." Findley stated that prior to the accident, he did not have any back or neck problems. The accident occurred on June 8, 2005, and according to Findley, since that date, his back and neck have hurt. Findley stated that he drives a dump truck and that

4

"about 2:00, 2:30 [he's] gone just as far as [he] can go. [His] neck and lower back will go to hurting bad, and [he'll] go to the house." Findley claimed that did not happen to him before the accident with Russell. Findley testified that he continues to work through the pain he suffers because he needs the money.

Findley described the accident as follows: "There was an Entergy truck in front of us and it was pulling a trailer, a pole trailer, and he went to turn in the drive at the school and he stopped and we had to stop because there was a pickup truck coming out and that's the [last] I remember of anything." Findley stated that the next thing he remembered was waking up in the hospital. Findley did recall that he saw the damage to the van approximately one week later and that the "[t]he back glass was knocked out" of the van, "[t]he tailgate was tore up," and "[t]he bumper and both seats were broke."

The instructions he received from the hospital staff before leaving was to "take it easy" and to see his family physician. When asked if he went to see his doctor, Findley replied, "No, sir. I came to your [Findley's trial counsel] office, and you seen that I had a doctor." According to Findley, he then went to see "Dr. Novelli" and "Dr. Ghadially" because he was "hurt and hurting." Findley stated that the doctors took x-rays and CAT scans of his neck and back.

Findley complained that at the time of trial, his neck and back were still "bothering" him. Findley claimed that his neck was worse than his back and that it "cause[d] him trouble during the day while [he] was sitting in the dump truck" and when he's at home at night trying to sleep. Findley testified that it hurt if someone simply touched his neck and that he takes Advil PM for the pain. Later, Findley stated that in

5

the morning, his back hurts worse than his neck and he still wears a back brace every day under his clothes. Findley was wearing his back brace during his testimony.

On cross-examination by appellees' trial counsel, Findley reiterated that he "lost consciousness completely" upon the impact and that he did not "wake up" until he arrived at the hospital. Findley acknowledged that he did not see the dump truck hit the back of the van; therefore, he was unable to dispute that Russell was traveling at approximately five miles per hour when the collision occurred. Appellees' counsel then posted Findley's emergency room records on the overhead projector and read portions of it during his examination of Findley.[2] Appellees' trial counsel stated, "It says: Denies loss of consciousness. Did you tell the people at [the hospital] that you did not lose consciousness?" Findley replied, "Sir, I don't remember what I said there after that lick in that car" and that if he were awake, he did not remember it. Findley stated that he could not explain why the emergency room personnel would document that he denied losing consciousness. Appellees' counsel then read that the report stated that the severity of the impact was minimal and asked Findley if that's how he described the impact of the accident to the emergency room personnel. Findley responded that he did not remember what happened after the collision occurred and that he did not see the dump truck hit the van. Findley stated that he did not know why the hospital personnel wrote that the severity of the impact was minimal in the report. Appellees' trial counsel then showed Findley that the report again stated that he denied loss of consciousness.

---

[2] Appellants did not file a designation of the reporter's record, and the exhibits admitted at trial are not included in the appellate record.

Findley reiterated that he did not remember anything after the collision and stated that he was telling the truth when he testified that he had lost consciousness. When asked if he was lying to the hospital personnel when he denied losing consciousness, Findley replied, "I don't remember, sir."

Findley testified that he told the hospital personnel that his neck hurt and that when he was asked to move his neck it was painful. Findley agreed that he did not have a "good range of motion . . . in his neck." Appellees' trial counsel then informed Findley that the report stated "under" neck, "Painless range of motion." Appellees' trial counsel asked, "Are they wrong about that," and Findley responded, "Yes, sir. My neck hurt." Findley did not know why hospital personnel would document that he had a painless range of motion in his neck.

Findley claimed that after leaving the hospital, he was still in pain; however, Findley did not go to a doctor even though the hospital personnel advised him to see a doctor. Findley explained that he went to get a prescription given to him at the hospital filled instead. Findley testified that after he got the prescription filled, he did not go to a doctor and went to see his lawyer. Findley's trial counsel "sent" him to Health and Medical Associates on June 22 about two weeks after the accident occurred. Findley went to the clinic with Mansfield.

Findley testified that he was given seventeen sessions of physical therapy from approximately June 23 to August 1. Findley and Mansfield went to physical therapy together. Findley's trial counsel then sent Findley and Mansfield to see "Dr. Ghadially" on October 20. Findley then went back to the clinic on December 20, 2005 and again

7

on January 4, 2006. Finally, Findley saw "Dr. Sanchez" on April 25 and May 23, 2006. Findley did not go to a doctor after that date and has continued working with Mansfield in the dump truck business, including loading the dump truck.

On re-direct examination, Findley testified that he was hurt after the accident and that he "vaguely" remembered being in the emergency room. On recross-examination, appellees' trial counsel asked, "Why did you stop going in June of '06 if you thought [the doctors] were helping you," Findley replied, "Because I don't want surgery. I'm still walking."

Mansfield testified that he is "a self-employed operator, sandpit owner, truck driver, dozer operator" and that his "normal job is to drive dump trucks or load dump trucks." Mansfield claimed that he was no longer able to "run" his "dozer" because "the vibration of the dozer cause[s his] sciatic deals to tighten up in [his] legs . . . ." Mansfield stated that Findley is his only employee and has been working for him for "about five years."

Mansfield described the collision as follows:

> Well, I was setting [sic] in my seat like this (indicating), with my hands on my steering wheel, and had a pretty good grip on my steering wheel; and you know when something bumps you, you'll naturally tighten up. And when that truck hit me, I tightened up and it tore my hands loose from the steering wheel and it broke my seat.

> My telephone, my lights, my pen, everything in my pockets was laying in the back seat. It actually just broke metal and all off of both seats; and, of course, both seats had the same impact. You could see the bumper mark all the way across the back of the van. It had the identical lick.

8

The record reflects that Mansfield's trial attorney then showed him a picture of the van and asked, "Does this exhibit show the seat backs broken (indicating)?" Mansfield replied, "Yeah. I can see the top of the seats are leaning back because, you know, once they broke, we never pulled them up again, you know."[3]

Later, Mansfield stated:

And, like I say, I had grabbed that steering wheel and I was pulling myself up like this (demonstrating) to try to get out and I was hurting so bad through here (indicating), my joints and my shoulders and all through here (indicating), that I couldn't pull—I didn't have the strength to pull myself up.

When you get a hard lick like that, it kind of numbs you.

And I was pulling myself up like this (demonstrating) out of the seat and I just let go and fell back in the seat and at that time I started looking for my phone to call to get some help or something and [Russell], when I looked up, she was there and told me she was very sorry that—and I'm sure she was. I'm sure she's a very good truck driver. She didn't do it intentionally. But she was apologizing, and I accept her apology.

When asked what happened to Findley, Mansfield stated that Findley was

flouncing like a fish or something, you know, and I thought he was trying to get up and I told him—you know, I could tell he was hurt.

I told him—I said, "[Findley], just lay still. Just lay still. Lay still. You may be hurt and just lay back and wait and let somebody help you."

And he never heard a word of it. He was colder than a cucumber and stayed that way until—the first time I heard him speak, we had been at the emergency room for a while before I ever heard him even in there saying anything, you know.

---

[3] The exhibit was admitted into evidence; however, as explained above, the exhibits have not been included in the appellate record.

According to Mansfield, the paramedics helped him out of the van and put him on a stretcher. Mansfield stated that the paramedics had "a lot of trouble" with Findley because he was "incoherent and out of it and resisting 'em, you know, like pushing 'em away and stuff like that; but he didn't know. . . ."

Mansfield testified that he did not go to the doctor "a lot" before the accident because he has always been "pretty healthy." Mansfield stated that he did not have any pain in his back or neck before the accident. However, he now has pain in his back and neck and is taking Tramadol four times a day but that he "really need[s] eight to dull the pain a little more." Mansfield claimed that the first thing he does in the morning is take two pain pills. Mansfield testified that he still wears a back brace due to the accident because it relieves "a little bit of the pain."

Mansfield stated that in addition to his back and neck hurting, his left wrist "got strained pretty good in it [the accident], and [he] bumped his right knee. . . ." According to Mansfield, his left wrist "gives [him] quite a bit of problem and wakes [him] up at night quite a bit. Nerves in the ends of [his] fingers, [he] can like reach and touch something and the nerves feel like they're right out on the ends, you know." Mansfield acknowledged that he had a problem with that wrist before the accident occurred because it had been hurt before.

After the collision with Russell, Mansfield had another accident at a service station, "which was actually [the] third time that [he] had [a] problem with [his] neck." When asked if he hurt his neck in the "second accident," Mansfield replied, "Actually it was the third time that I hurt my neck. Once on the job, I was just setting on a rig.

10

That's been—had a slight bump, and it paralyzed me for just a few minutes." Although Mansfield's trial counsel asked him to clarify when this event occurred, Mansfield simply agreed that something happened sometime in June 2005.[4] Earlier, Mansfield stated that one of the "paralyzing" incidents may have happened "probably four months, five months—no, it was a year probably, probably a year before that."[5] When asked if he went to the doctor after being "paralyzed," Mansfield said, "Well, I had already been to the doctor before, you know, and I had all this damage in my neck and I kind of chalked it up to that's just part of what I'm gonna have to live with, you know."

Mansfield testified that on another occasion while he was on a track hoe digging, he strained his neck; however, this time he did not suffer any paralysis. He stated that his "neck just started hurting real bad, real severe" and that he had headaches that felt "like the top of [his] head was about to blow off." Mansfield went home to bed. Mansfield testified that on another occasion, about a year before the trial, his vehicle hit a pothole and he "slammed" his head against the ceiling. Mansfield claimed that he was paralyzed again "real bad" and that he could not "control anything." Paramedics transported Mansfield to the hospital, and he had surgery. According to Mansfield, the surgery helped his neck pain but that when he moves his neck a certain way that he demonstrated for the jury it "pops."

---

[4] It is unclear whether Mansfield meant that the accident with Russell happened in June 2005 or whether the incident where he became "paralyzed" while injured "on the job" also happened in June 2005.

[5] Again, Mansfield did not clarify what event he was describing or the year that it occurred.

Mansfield testified that he is still suffering from the back pain. He stated that it "starts right under [his] belt, was where the pain starts, comes up [his] back about this far (indicating); and that's in the lower part." Mansfield also claimed that he has pain in the "higher part" of his back starting "right at the base of [his] neck, right here (indicating), it hurts. . . ." down to between his shoulders. Mansfield stated that he has a bump "more or less at the base of [his] neck where it ties to [his] spine (indicating)."

On cross-examination by appellees' trial counsel, Mansfield testified that he did not believe it was important to tell hospital personnel the truth regarding what happened during the accident; however, Mansfield claimed that he did not say that it is okay to lie to the hospital personnel. Appellees' trial counsel then showed Mansfield a copy of his emergency room records from the day of the accident. Trial counsel asked Mansfield if he told emergency room personnel that Russell's vehicle was traveling at five miles per hour as documented on the report. Mansfield replied, "It's possible I could have said 5 miles an hour. It is possible, but I don't think so." Mansfield then stated that he did not remember how fast Russell's vehicle was traveling when the collision occurred and that it could have been five miles per hour or twenty miles per hour; Mansfield then said, "Go with 5 miles per hour." When asked why hospital personnel would have documented that Russell's vehicle was traveling five miles per hour, Mansfield replied, "They could have been a idiot. . . ." Appellees' trial counsel then asked Mansfield why the report stated that the severity of the impact was minimal, and Mansfield denied making such a statement to hospital personnel.

The report also documented that Mansfield complained that he had pain in the neck, shoulders, back, arms, and knees. Mansfield testified that at the hospital, his neck was checked and that it was hurting. He was asked to move his neck around in order to check the range of motion and he told hospital personnel that his neck hurt. When asked if he was able to move his neck, Mansfield said he could but with pain. Mansfield acknowledged that the report documented that his neck was "not tender, not hurting." Appellees' trial counsel showed Mansfield that the report documented that Mansfield had painless range of motion—meaning that he "had no pain when [he] moved [his] neck around like that." Mansfield disputed that he had painless range of motion and stated that he "felt" pain.

Mansfield acknowledged that he did not visit his family doctor after leaving the hospital and instead went to see a lawyer. According to Mansfield, his lawyer then sent him to Health and Medical Practice Associates, where he began receiving physical therapy. Mansfield agreed that he last went to see the doctor regarding his back in June 2006. When asked which doctors he saw between June 2006 and June 2007 "for this injury," Mansfield stated, "None," but claimed that he was "hurting." Mansfield explained that he did not go to a doctor for the pain because he was "under the impression that the only thing else they could do to [him was] that severe surgery that [he] hears so much about that [he would] rather take [his] chances like [he] was going." Mansfield acknowledged that in November 2006 he went to see his family physician, "Dr. Oh," for a lump on his right arm or elbow and that he did not inform Dr. Oh that he was suffering from pain in his neck or back. Mansfield stated that he visited Dr. Oh

13

again in December 2006, and again failed to mention that he had pain in his neck and back.

When asked if he was "blaming" Russell for the subsequent incident wherein he hit a pothole, bounced, and hit his head in his dump truck suffering paralysis, Mansfield said, "Yes, sir." After hitting his head, Mansfield went to the hospital. The emergency room report for that incident stated:

> This is a 63-year-old white male who was admitted yesterday with severe neck pain and paresthesias with weakness to both arms. The patient had been in a—had been seen a couple of years ago after a car accident [with Russell] with low back strain, as well as some cervicalgia from low whiplash injury. He did very well with conservative treatment, including physical therapy and medications.

Mansfield testified that he did not know why the hospital staff determined that he did "very well with conservative treatment." Mansfield acknowledged that, subsequent to the accident with Russell, he hit the top of his head on the roof of his truck and suffered from symptoms of weakness in his arms, paresthesias, and severe neck pain. Mansfield stated, "I told 'em [hospital staff] that I had hurt my neck and my arms, you know, that I had paralyzed in my—the arms." When asked, "So, everything in this history is true except for the fact that you did well with conservative treatment, including physical therapy and medications, from the first accident [with Russell]. Would you agree with that," Mansfield replied, "I guess."

On June 22, 2007, Mansfield again went to the hospital complaining of severe neck pain and weakness in both arms. Mansfield acknowledged that the medical history report documented that he had hypertension and gouty arthritis. Appellees' trial

14

counsel read from the report, stating, "[I]t says: (Reading) Two years ago [Mansfield] had a car accident and had a low back strain. Is that correct?" Mansfield denied that the "muscle pull" occurred in his lower back and that he told the hospital personnel that the muscle pull was in his lower back. Appellees' trial counsel asked if the report stated that Mansfield had injured his neck or back in the accident with Russell, and Mansfield replied, "No." Mansfield claimed that he did not know why he failed to inform the hospital personnel of his previous back and neck injuries.

James Davis, M.D., an occupational medicine physician with ExxonMobil, testified as appellants' expert witness. According to Dr. Davis, after the accident with Russell, Mansfield had "cervical strain/sprain-type injuries, sometimes referred to as whiplash injury; lumbar sprain, or lower back sprain. . . ." and possibly a knee injury, while Findley had "[s]imilar injuries and lumbar sprain-type injuries." Dr. Davis stated that he believed that there was a "potential" that Findley and Mansfield would require surgery as a result of the accident with Russell. Dr. Davis testified that both Findley and Mansfield had "some degenerative disc diseases." When asked if they had no pain before the accident and then had pain in their necks and backs after the accident, "would it be [his] opinion that the accident caused the pain," Dr. Davis replied, "Yes." Dr. Davis testified that he believed that the neck and back pain were a result of the accident. According to Dr. Davis, most people Findley and Mansfield's age "would have some degree of degenerative disc disease" but not everyone suffers pain from the disease.

15

Dr. Davis explained that Mansfield had cervical and lumbar radiculopathy, "which suggests nerve irritation or—or nerve involvement related to the cervical and the lumbar injuries." Dr. Davis opined that those injuries were not present prior to the accident and that "within a reasonable medical probability, the—the radicular nature of the symptoms, the neck pain and the back pain that radiated into the arms and the legs was or can be attributed to the—to the accident." Dr. Davis explained that Findley "also had cervical, or neck sprain-type injuries, as well as low back, or lumbar sprain injuries." Dr. Davis was not sure whether Findley had "cervical radiculopathy" or "lumbar radiculopathy." Dr. Davis believed that Mansfield's subsequent surgery was "likely" a result of the accident with Russell and that Findley sustained a "permanent physical impairment" from that accident.

On cross-examination, Dr. Davis testified that he did not examine Findley or Mansfield and only reviewed their medical records. When asked, Dr. Davis explained that "'compensation neurosis' is a term . . . that a physician would use to refer to a patient who perhaps is faking or has some secondary gain in the system, really gaming the system." Dr. Davis explained, however, that he would not use the term compensation neurosis in his practice to describe his patients and would perhaps use the term "malingering" instead. When asked if based upon his review of Findley's and Mansfield's medical records "one doctor that said this accident [with Russell]—that their condition was a result of this accident," Dr. Davis replied, "I don't specifically remember seeing that phrase used. . . . [And] to [his] knowledge, they didn't explicitly say that." However, Dr. Davis again opined that "[b]ased on reasonable medical probability of the

mechanism of the injury, what I know is in their medical records from the physicians that evaluated them and treated them, what was shown on their accident resulted in—in their medical condition."

When asked about the "pothole injury," Dr. Davis stated:

I—in my understanding of—of the medical records and the second injury subsequent treatment, I think this was probably the straw that broke the camel's back. So, I certainly think his—his [Mansfield's] pothole injury is what resulted ultimately in him going to the emergency room and leading to the surgery; but I—I don't think that injury was solely responsible for the condition that led up to surgery.

Dr. Davis acknowledged that the doctor who performed the surgery on Mansfield in 2007, "Dr. Lo," did not document that the operation was a result of the accident with Russell in 2005. However, Dr. Davis explained that Dr. Lo would have no reason to specifically mention the 2005 accident as a cause of the surgery. Appellees' trial counsel then showed Dr. Davis Mansfield's emergency room records; however, because it is unclear from the record which document was shown to Dr. Davis, it is unclear which incident generated those records. Dr. Davis acknowledged that the record documented that Mansfield had degenerative disc disease and did not mention that he suffered "neck problems" in 2005. When asked to explain what the notation "Neck, nontender and painless range of motion" meant, Dr. Davis responded, "'Nontender' means that on palpation of the neck[,] there was no tenderness elicited" and that palpation meant, "You touched on it. You pushed on it" and there was no pain. Regarding the "painless range of motion," Dr. Davis explained, "That means on movement of the neck in various directions did not cause pain . . . ." However, Dr.

17

Davis noted that on the report "muscle spasm" was circled, which seemed contradictory because "typically" muscle spasms are painful.

Dr. Davis was then asked to review Findley's emergency medical records from the date of the accident with Russell. Dr. Davis agreed that the report indicated that when the doctor "put [Findley] through the range of motion in his neck," he had "no pain." Dr. Davis stated that there was no sign that Findley suffered any head trauma in the accident and that report reflected that Findley denied that "he had any loss of consciousness."

Thomas Greider, M.D., an orthopedic surgeon, testified by videotaped deposition as appellees' expert witness after reviewing Findley's and Mansfield's medical records. Appellees' trial counsel showed Dr. Greider "Exhibit No. 2," identified as records from the emergency room of Christus St. Elizabeth Hospital.[6] Dr. Greider explained that Mansfield's medical history showed that he was involved in a motor vehicle accident, his vehicle was struck from behind, and the impact occurred at "an extremely low rate of speed, 5 miles per hour." According to Dr. Greider, Mansfield complained of neck, back, and knee pain; however, all tests, including x-rays of his neck and back and a CAT scan of his brain and neck showed "there was no evidence of any acute injury"— meaning there were "no problems related to the motor vehicle accident."

Dr. Greider testified that the CAT scan showed that Mansfield had degenerative disc disease but that the disease was not related to the accident because it is typical to find degenerative disc disease in men Mansfield's age. Dr. Greider opined that the x-

---

[6] It appears that the records were from the June 8, 2005 accident.

rays and CAT scan were unnecessary in Mansfield's case because "he did not meet the Nexus criteria." Dr. Greider explained:

> Nexus criteria stands for National Emergency X[-]ray Utilization Study and it was actually a—a scientific study done to determine the need for X[-]rays of the neck specifically in emergency situations and the purpose of that study was is that several criteria were identified that if they—if those criteria were present, you needed an X[-]ray of your neck 'cause you could have something wrong with your neck.

> If you didn't meet the criteria, you didn't need an X[-]ray because—and I think the results were like 99.9 percent likelihood that you did not have a neck injury.

Dr. Greider testified that his diagnosis of Mansfield "was that he—in the emergency room that he had cervical spondylosis, lumbar spondylosis, whiplash associated disorder, and back pain." Dr. Greider opined that the cervical spondylosis and lumbar spondylosis were not "created, caused, or aggravated by this [June 8, 2005] accident." However, Dr. Greider believed that the whiplash disorder and back pain were related to the accident. Dr. Greider explained that "[w]hiplash associated disorder is defined as neck pain following an injury to the neck, classically an automobile accident, in the absence of fractures or dislocation."[7] According to Dr. Greider, the "best treatment" for whiplash associated disorder is "no treatment and reassurance to the patient that they have no injury to their neck; nothing's broken; and that, to do the very

---

[7] Dr. Greider stated that the issue of the injury that occurs when a person has whiplash associated disorder has been debated for 150 years. Dr. Greider explained:

> The culprits have included the discs in the neck, the ligaments in the neck, the little joints in the neck called facet joints. It's also in—in—in—can be considered inner ear problems, jaw problems, brain problems; and there's nothing ever—ever been definitively diagnosed as the essential anatomic abnormality that—that is created by whiplash associated disorder.

19

best, that they resume normal activities as quickly as possible." Dr. Greider stated that when Mansfield left the hospital, there was no medical treatment necessary and that he would have probably been sore for a few days and then he would have been well.

Dr. Greider stated that he did not believe that Mansfield's surgery was related to the June 8, 2005 accident. Furthermore, Dr. Greider opined that Mansfield did not sustain permanent impairment from that accident and did not require any ongoing medical treatment to cure any potential injuries from that accident. Dr. Greider stated that Mansfield "was at maximum medical improvement on the day of the [June 8, 2005] accident after he was evaluated in the emergency room." Dr. Greider explained that maximum medical improvement occurs "as that date and time after which there's known—no medical treatment that's gonna impact or change the course of the disease . . . ."

Regarding Findley, Dr. Greider stated he was diagnosed with cervical spondylosis and whiplash associated disorder. Dr. Greider opined that Findley did meet the Nexus criteria for x-rays because he had tenderness in the midline of his cervical spine. Dr. Greider stated that the x-rays showed the "spondylosis or the bone spurs and degenerative disc disease at multiple levels, which are typical findings in a person who has degenerative disc disease." Dr. Greider testified that the accident did not cause the degenerative disc disease or any of the other abnormalities shown in Findley's x-rays.

Dr. Greider testified that Dr. Davis, appellants' expert witness, "has no qualifications to render any expert opinions involving the diagnosis and

20

recommendations for treatment with musculoskeletal disease."  Dr. Greider later explained that a family physician such as Dr. Davis has "qualifications—they're medical doctors—to identify simple problems and treat simple problems; and they are also trained to identify complex problems or the potential for complex problems and sent them to specialists that can take care of 'em."  Dr. Greider acknowledged that family physicians have training in muscular skeletal problems, but that the training is not "significant" and "certainly not enough to, you know, render expert opinions about particularly complicated issues like this."

Dr. Greider cited a study wherein it was found that "the incidence of neck pain following auto accidents that showed no correlation between the incidence of neck pain and people having accidents.  In other words, if you had neck pain, you were—you were just as likely to have this neck pain for no reason as opposed to being in an accident." Dr. Greider explained that in another study "reviewed from Cornell University in New York where they reviewed demolition car drivers. . . . 50 demolition car drivers with an average of 40 or 50 rear-end collisions and a couple of 'em had a neck pain from time to time but they weren't particularly bothered with an ongoing neck problem."

On cross-examination, Dr. Greider testified that there is no objective test for pain and that pain is "strictly subjective."  Dr. Greider opined that pain is by definition subjective and that "the only thing that a doctor can do is find objective evidence that corroborates what the patient's telling 'em and, of course, in this case there is none." Dr. Greider stated that Findley and Mansfield complained of "neck and back pain after

21

the auto accident" but that "there's some question, you know, about the validity of that—even that history."

Dr. Greider stated that if Findley and Mansfield claimed that they were in pain, as a physician, he has "to assume" they are in pain. Dr. Greider explained that "compensation neurosis is a pain syndrome that is characterized or defined by a—a painful condition in a person in the presence of compensation or litigation issues that don't get well with typical recommended treatment." Dr. Greider stated that he uses that term in cases that "involve people that are in an accident with no identifiable injury but continue to have symptoms, continue to have treatment, and never get well from that treatment . . . ." Dr. Greider testified that he does not usually diagnose a person with a broken leg with compensation neurosis; however, if someone has "neck pain after low speed collisions and don't have any fractures or dislocation, that's a frequent diagnosis, particularly two years later." Dr. Greider opined that compensation neurosis is "the diagnosis that accounts for their [Findley's and Mansfield's] symptoms." When asked what could have caused the pain experienced by Findley and Mansfield besides the accident with Russell, Dr. Greider responded that it could be caused by the compensation neurosis or by the degenerative disc disease that pre-existed the auto accident. Dr. Greider opined that the abnormalities in the appellants were "in all medical probability, years old, possibly decades."

On redirect examination, Dr. Greider stated that neither Findley nor Mansfield has seen a doctor in four years regarding their alleged pain in their necks and backs. Dr. Greider acknowledged that appellants' trial counsel had shown him copies of some

22

M.R.I.s that had some various abnormalities including spinal stenosis, lumbar disc disease, and osteophytes—bone spurs on the vertebra.[8] Dr. Greider testified that none of these abnormalities were caused by the June 8, 2005 accident and both men's abnormalities existed before the accident "based on reasonable medical probability." Dr. Greider also opined that the accident did not cause the degenerative disc disease in either man.

## II. PROCEDURAL HISTORY

After both sides rested, the jury found that Russell was seventy percent responsible for the accident and that Mansfield was thirty percent responsible. For medical care expenses incurred in the past, the jury awarded Mansfield $10,000 and Findley $5,000. The jury awarded zero damages to Findley and Mansfield for physical pain and mental anguish sustained in the past and that, in reasonable probability, will be sustained in the future. Appellants filed a motion for new trial that the trial court denied. Appellants challenge the factual sufficiency of the evidence supporting the jury's award of zero damages and the trial court's denial of their motion for new trial.

## III. STANDARD OF REVIEW AND APPLICABLE LAW

We review a trial court's decision to deny a motion for new trial under an abuse of discretion standard. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). A trial court abuses its discretion when it acts "'without reference to any guiding rules or principles' or, stated another way, when the trial court acts in an arbitrary and

---

[8] Again, because the exhibits are not included in the appellate record, we are unable to determine whose M.R.I. showed which abnormality. On cross-examination, although appellants' trial counsel mentioned the abnormalities, he did not clarify which appellant had which abnormality.

23

unreasonable manner." *City of San Benito v. Rio Grande Valley Gas Co.*, 109 S.W.3d 750, 757 (Tex. 2003) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985)). We may not substitute our own judgment for that of the trial court when reviewing matters committed to the trial court's discretion. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than the appellate court would in a similar circumstance. *Downer*, 701 S.W.2d at 242.

A party attacking the factual sufficiency of an adverse finding must show that the adverse finding is against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). In order to set aside the verdict, we must be able to "detail the evidence relevant to the issue" and then state how the contrary evidence greatly outweighs the evidence that supports the verdict. *Id.* We may not substitute our judgment for that of the fact-finder's conclusions because the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792, 796 (1951).

"If the jury has enough evidence upon which reasonable minds could differ, we may not substitute our judgment for that of the jury." *Monroe v. Grider*, 884 S.W.2d 811, 820 (Tex. App.—Dallas 1994, writ denied) (citing *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986)). We recognize that "a preponderance of the evidence did not convince the jury where it did

24

not find a fact" and "[w]e may not reverse merely because we conclude that the evidence preponderates toward an affirmative answer." *Id.*

"To uphold a jury's finding that an injured party incurred no damages for past pain and suffering, the jury must have found by a preponderance of the evidence that no pain and suffering accompanied the injury." *Lamb v. Franklin*, 976 S.W.2d 339, 341 (Tex. App.—Amarillo 1998, no pet.). A jury may "disbelieve a witness, including a physician, even though his testimony is not contradicted." *Walker v. Ricks*, 101 S.W.3d 740, 748 (Tex. App.—Corpus Christi, 2003, no pet.). "The judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not conclusive on the jury or trier of fact, unless the subject is one for experts or skilled witnesses alone, where the jury or court cannot properly be assumed to have or be able to form correct opinions of their own based upon evidence as a whole and aided by their own experience and knowledge of the subject of inquiry." *Waltrip v. Bilbon Corp.*, 38 S.W.3d 873, 882 (Tex. App.—Beaumont 2001, pet. denied). Moreover, "the presence or absence of pain, based on the subjective complaints of an individual, is not a subject for experts or skilled witnesses alone." *Id.*

In cases where the plaintiff's symptoms are subjective, a jury is free to award medical expenses and still disbelieve the plaintiff's complaints of pain. *Id.* at 880. "The presence or absence of 'physical pain' is inherently subjective to the individual." *Id.* at 881; *Biggs v. GSC Enters., Inc.*, 8 S.W.3d 765, 769 (Tex. App.—Fort Worth 1999, no pet.); *see also Luna v. Torres*, No. 13-07-00471-CV, 2009 Tex. App. LEXIS 6972, at *12 (Tex. App.—Corpus Christi Aug. 31, 2009, no pet.) (mem. op.).

25

The issue of awarding damages for mental anguish and pain and suffering is difficult "because the injury constitutes a subjective, unliquidated, non-pecuniary loss." *Waltrip*, 38 S.W.3d at 881. Therefore, the jury is given wide discretion when determining the amount of damages it determines is appropriate for pain and suffering. *Id.*

## IV. DISCUSSION

Appellants arguing that the evidence proved that they each had an objective injury, cite exhibits admitted at trial, including the men's medical records, M.R.I. reports, and a police officer's note that they had an incapacitating injury. None of the exhibits that were admitted into evidence at trial have been included in the appellate record, including those cited by appellants.

> When the reporter's record is incomplete, a presumption arises that the missing portions of the reporter's record support the trial court's judgment. A party who wishes to file a partial reporter's record can rebut this presumption by filing and serving a request for partial reporter's record which states the points of error to be relied upon for the appeal. A presumption then arises that the omitted portions of the reporter's record do not affect the outcome of the appeal.

*Jaramillo v. Atchison, Topeka & Santa Fe Ry. Co.*, 986 S.W.2d 701, 702 (Tex. App.—Eastland 1998, no pet.). Appellants neither filed and served a request for a partial reporter's record on appellees nor stated the points of error they would be relying upon pursuant to rule 34.6(c). *See* TEX. R. APP. P. 34.6(c); *Jaramillo*, 986 S.W.2d at 702. Therefore, we must presume that the missing exhibits support the jury's findings of zero damages. *See Milacron Inc. v. Performance Rail Tie, L.P.*, 262 S.W.3d 872, 876 n.2 (Tex. App.—Texarkana 2008, no pet.) (providing that when an incomplete record is

26

filed, every reasonable presumption will be indulged in favor of the jury's verdict); *Jaramillo*, 986 S.W.2d at 702 (citing *Christiansen v. Prezelski*, 782 S.W.2d 842 (Tex. 1990)); *Cooper v. Bowser*, 610 S.W.2d 825, 828 (Tex. Civ. App.—Tyler 1980, no writ) (setting out that "reversal will not be ordered unless it appears that on no possible state of the case could the ruling be upheld"); *see also Wright v. Mack Motor Truck Corp.*, 336 S.W.2d 831, 833 (Tex. Civ. App.—Houston 1960, no writ).

In this case, the evidence concerning whether appellants suffered pain as a result of the accident is almost entirely subjective, primarily based on appellants' own personal reports of pain to doctors, and their own testimony. *See Biggs*, 8 S.W.3d at 769 (explaining that "[a]ppellate courts are reluctant to overturn jury findings of no damages for pain and suffering when the indicia of injury and damages are more subjective than objective"); *see also Luna*, 2009 Tex. App. LEXIS 6972, at *12 ("A jury may award 'zero damages' when the injuries sustained are subjective in nature or there is both subjective and objective evidence of damages."). The jury heard evidence that Findley's and Mansfield's complaints of pain were unrelated to any objective injury, and it heard evidence from Dr. Davis that the accident caused their pain. Dr. Greider opined that the appellants' pain could have been caused by the pre-existing condition of degenerative disc disease; evidence was presented that both men had the disease before the accident with Russell. The jury heard evidence that Findley and Mansfield suffered from whiplash associated disorder; however, Dr. Greider explained that this disorder has no known anatomic abnormality and that a person with the disorder has no injury to the neck. *See Rodriguez v. Kvasnicka*, 710 S.W.2d 724, 726 (Tex. App.—

27

Corpus Christi 1986, no writ) (stating that whiplash injuries "are subjective in nature"); *Martin v. Warren Miller Co.*, 639 S.W.2d 706, 707 (Tex. App.—Tyler 1982, no writ) (explaining that cases affirming the jury's award of zero damages for pain and suffering involved whiplash injuries to the neck and back which are "predicated basically upon plaintiff's subjective complaints"). Dr. Greider also informed the jury that in this case, there was no objective evidence corroborating appellants' complaints of pain or injury and that there was a question as to the validity of their complaints. The jury also heard evidence that, after the accident, Findley and Mansfield had no pain when their range of motion was tested at the hospital. As to Mansfield, the jury heard evidence that the hospital records including x-rays and a CAT scan showed "no evidence of any acute injury" to his neck and back. As to Findley, the jury heard evidence that the accident did not cause any abnormalities found in his x-rays on June 8, 2005. Furthermore, because the doctors relied on Findley's and Mansfield's subjective complaints of pain, the jury was free to disregard their testimony concerning whether Findley and Mansfield suffered from pain after the accident. *See Waltrip*, 38 S.W.3d at 882. The jury was also free to believe or disbelieve Findley's and Mansfield's testimony that they suffered pain after the accident and Dr. Davis's opinion that the accident caused their injuries. *See id.*

We accept and will not interfere with the jury's resolution of any conflicts or inconsistencies in the evidence in determining the sufficiency of the evidence. *See Monroe*, 884 S.W.2d at 820. Moreover, considering and weighing all the evidence, we are unable to state that the contrary evidence greatly outweighs the evidence in support of the jury's findings. *See Pool*, 715 S.W.2d at 635. Therefore, we cannot conclude

28

that the evidence supporting the jury's finding of zero damages for physical pain is contrary to the overwhelming preponderance of the evidence. Furthermore, because we have concluded that the evidence is not factually insufficient to support the jury's finding, we cannot conclude that the trial court abused its discretion when it denied appellants' motion for new trial. *See Waffle House, Inc.*, 313 S.W.3d at 813; *City of San Benito*, 109 S.W.3d at 757. We overrule appellants' sole issue.

## V. CONCLUSION

We affirm the trial court's judgment and denial of appellants' motion for new trial.


_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
20th day of October, 2011.

29